Okay, the first case on our call is Homer v. Illinois Department of Children & Family Services, 513-0112. It's ready to proceed. And speak up because we're recording. And counsel may be standing a little bit. She has a back up, so. You may proceed. Good morning, Your Honors. Good morning, Your Honor. Morning. Illinois Assistant Attorney General Carl Helitz from the Connect Board, Department of Children & Family Services. May it please the Court. Your Honors, this is a case, as you know, where the Department found Officer Holder, a child protection specialist at Harrisburg. He struck C.C., a minor, 17-year-old, twice in the face with closed fists, leaving the boy with a bruised eye and a one-inch cut on his cheek, which bled. My opponent argues that C.C. was not a child under the Act, but Section 2 is quite clear. Anyone under the age of 18 who is not married and is not in the military is a child for purposes of the statute. Also, Mr. Holder was a person responsible for child welfare at an agency or institution, making him a person responsible under the statute for possible indication of child abuse, which he was. Mr. Helitz, is that your name? Yes. Are you aware of any case in Illinois that's ever held that a prison guard is a caretaker or caregiver, I'm sorry, under this Act? No, Your Honor, I'm not, but I don't believe that Mr. Holder was a prison guard. Well, let's use the word caregiver, okay? That's the word used under the Act? Yes. It would seem to me that if we do what you ask, that we will allow DCFS to be coming in on every individual who takes care of children in the Department of Corrections. Is that basically what you want us to do? I don't know if a child who is committed to the Department of Corrections would be subject to the Act. I assume a person would be because that person would be a caretaker, but I haven't considered that question because IYC Harrisburg, the youth center in Harrisburg, is not a prison. How do children get there? I don't know, Your Honor. I know that this particular child was found to have escaped another institution and was sent to this one. So it doesn't come through the Juvenile Court Act? It doesn't come through a penal system at all? I just don't know, Your Honor, and I'm sorry about that. I don't know how this youth got to this center or whether the youth at this center are all necessarily from the court system or not. It seems obvious that some of them are, but I'm just not sure whether it matters, though. And I think my answer to your question is that if a person is under 18 years old and if they're in an agency or institution and have caregivers, caregivers are responsible to not abuse them under the statute. I'm just wondering how we distinguish between a caregiver under the definition of the Act and someone who is responsible for maintaining order in a prison-like facility. How do we distinguish? Well, one logical place, but I'm not sure the correct legal place would be to say that institutions where we serve adults may have different rules, and I'm not sure they do. I'm not sure the Department would agree with that distinction. I know that the Department takes the position that children at youth centers like the one in question here are subject to the Act, and Mr. Holder was a person responsible for a child's welfare at an agency or institution under Section 2. So, therefore, it's our position that the statute applies to him. Okay. Once there's an indicated preliminary finding by the Department, a person indicated has an opportunity to request a hearing before the agency, and Mr. Holder did. At that hearing, the Department carries the burden of showing by a preponderance of the evidence that its actions in indicating a child abuse situation was correct. And I would suggest to the Court that there is plenty of evidence here. I think it can be characterized as overwhelming evidence that there was an incident of child abuse here. The boy's face was cut. There are photographs in the supplemental record, page 120, showing the boy's facial injuries. My opponent characterizes them as minor, but I don't know how anyone can fairly do that. The boy had a contusion on his eye that had been cut on a space blade. The operative term under the Act is that there be a disfiguring injury, and disfiguring is certainly what happened to the boy's face. The fact that he didn't require stitches or wasn't taken to a hospital is not responsible. So we have a minor child under the Act who has been injured and disfigured, and so Mr. Holder is subject to abuse allegation. Did these alleged injuries happen before or after the headlock? The finding of the agency was that they happened after the headlock, and that's consistent with- Or not to get out of the headlock? Correct. But that's consistent with what Mr. Holder told police investigators and other investigators who interviewed him very near the time of the incident. He said that the boy had him in a headlock, he pushed out of the headlock, and then punched the boy in the face. That is consistent with the injuries that were documented because the boy testified that he was thrown against the back wall and scraped his shoulder. So that course of events makes some sense. The hearing officer found that the boy was- had Mr. Holder in a headlock that he excreted himself. Mr. Holder testified differently, though. The hearing officer did not credit Mr. Holder's testimony, but Mr. Holder's testimony was that he was punching up to get out of the boy's headlock. That doesn't make sense with regard to physical injuries because the boy did scrape his shoulder, that's obvious. And a punch up would not throw the boy against a back wall, which seems obvious as to what had happened because the boy's shoulder was injured. Excuse me, was there any other testimony other than Officer- Mr. Holder's that put Mr. Holder in the cell? There was lots of testimony that put Mr. Holder in the cell. Was there any testimony other than Mr. Holder's that kept him out of the cell? I can't recall any, Your Honor. My opponent may tell you differently. I believe all the witnesses who testified said that they couldn't see Mr. Holder, like Officer Johnson, who was a distance away, said she couldn't see him because he was not out in the common area. So there appears to be a rectangular or square area with cells all around and there's doors, and I forget whether the doors open out or in. I think they may open out, but regardless, there's evidence that he was inside the cell, which is a problem for someone who's claiming that he wasn't an aggressor because there was no reason to be in that cell if all he was doing was trying to counsel the boy, which is what his testimony was. Which brings me to that particular testimony. Mr. Holder testified that he was concerned that the boy was using racial inflammatory language and he needed to be counseled. That doesn't make a lot of sense considering that the door was clearly closed at one point. The boy screamed through the door with his cellmate, C.R., in the cell with him. It wasn't a counseling session that was happening, which is obvious from the fact that there's a recording in the record of a phone call another inmate was making at the time. And that phone call suggests that there had been a lot of screaming going on long before the actual punching incident, which is also an event which was recorded on the phone call. Is this a solid door? What's this door like? There was some testimony about the door, but I don't recall whether it's solid or whether there's bars or whether there's a way through. There's clearly some way for the inmates who are inside the cell to call out because it's clear that that's what was happening. Officer Holder wasn't sure who was yelling out the door, apparently. One of the witnesses said that it was only until after he got to the door and realized it was not C.R., the second youth who was put there, but it was the first youth that was there, C.C., who was the boy who was indicated. Well, what I'm getting at is if the door was open, could they see through the door or not? I don't know. Which way it opened? Again, I don't recall whether there was testimony about which way the door opened or not. But there was no testimony that anybody saw anything from outside, isn't there? No. The cellmate, C.R., was expelled from the cell. Officer Holder told him to go outside, and he testified as to seeing the blood in the room. He testified as to seeing the punch. So he obviously could see into the cell. Wasn't the recording at the end say something like, I just saw somebody beat somebody up? Yes. That's the end of the call. So that way we know that the sounds that we're hearing are prior to the assault and not some other time. But if you're on a phone somewhere, you had to have been able to see into the cell. No, because I think what happened immediately was the boy was removed from the cell after he had been punched down and was taken to the nurse's office. The nurse, I believe, was where he was taken. And the officer Holder came out, so the person who was on a phone call away from the incident would be able to say, I've just witnessed a guard strike another person. In other words, you're saying he did see. I don't think he saw it, Your Honor. I think he saw that there was a guard who struck another youth. But I don't know that he actually saw the punch. He saw the bloody face, perhaps. He saw the boy being taken to the nurse. So you assume that the punch made the bloody face. I'm assuming that's true. But what we do know from that call, which is why I think it's relevant, is that we have Officer Holder for minutes before this incident screaming. His voice was recognized by one of the witnesses. So he's screaming loud enough. He picked up on a phone call. It's not necessarily very close to him. And yet, so he's obviously upset. So the suggestion that he's there to try to counsel a boy who could be a danger to himself by using this kind of language doesn't make a lot of sense. Well, see, I thought CC was the one screaming. The expert was. We have a witness who testified that he recognized Officer Holder's voice on the tape screaming. What about the language that was being used by CC? I thought there was some. I think everyone is in agreement. ALJ found that CC was using inappropriate language. What type of language was this? He called Officer Holder a nigger, Your Honor. And so Officer Holder was accused by CC of having called him a gay. And so the two of them are apparently in this verbal back and forth with the door closed. At that point, Officer Holder opens the door. He says he's going to counsel the boy, but he's obviously very angry, with good reason. He tells the roommate to leave the cell. He pulls the property boxes out of the cell. And the only reason that makes sense to do that is— That was the property boxes for the roommate, wasn't it? There were two boxes, one for each boy. And the boy's testimony— The boy's boxes were pulled out? Yes. And the testimony was that the boys were using the property boxes as a card table. So they pull them out, they stack them, and they play cards on them. And so I think the evidence is pretty clear. The card table or the boxes were between Officer Holder and the boy. So the officer is ordering the cellmate out into the common area. He removes the property boxes. And he must step inside the room at least to get close enough to punch the boy. The administrative law judge, the ALJ, found that at some point Officer Holder was free of the physical altercation and could step out and shut the door. And how far away would he have been from him? Like a foot and a half, two feet? Again, there's photographs of the cell on the record. And the ALJ toured the facility and saw the cell. So he had the benefit of that information. I don't know if the photographs capture it, but these cells are all the same. They have beds, a place to sit, a toilet, and in this case there was a window. It's not very big. I think that's a fair statement. And I think that may account for why there's some disagreement about whether Officer Holder was inside or outside the cell. The ALJ apparently found that he was in the vicinity of the door. Now, Officer Holder testified that after the physical confrontation, after the boy was bloodied, he raised his hands and he backed out. He says he backed out and shut the door. The ALJ's finding was that should have happened long before the physical altercation. In fact, it seems unreasonable for the officer to have opened the door. CC and CR were not a threat to each other or themselves. They were CC anymore and was out of control of his screaming. That's not the time to counsel a boy about his screaming problem. They were locked up. Officer Holder should have just let them stand locked up. He could have disciplined them other ways. But instead he actually opened the door after it was locked and did these other things, removing the boxes, removing the boy. He was an aggressor in this situation. He was going to remove CD from the cell, not CC, right? Am I wrong? He removed CR from the cell. Or CR. CR. He ordered CR to leave the cell. Then he removed the property boxes. Now, there's conflicting testimony. CC testified that he threw the boxes at them. They were batting them back and forth, and then they got thrown into the hallway. In their briefs, my opponent doesn't really talk about those boxes at all. The boxes are kind of interesting because it shows some forethought by Officer Holder in wanting to get into that cell and get close enough to CC. Why is he getting so close to CC? Well, CC testifies that he's being taunted, that the officer is saying, hit me, hit me, why don't you hit me? Now, if we put aside CC's testimony as not being truthful, it doesn't matter. We still have the officer going up against the young man in the cell, pulling things out of the cell, removing the cellmate. It doesn't make for a case where Officer Holder is in fear for his life and trying to get away. Were they of similar size? We don't know that, Your Honor, and I tried to figure that out, and I put it from the record. I can tell you that there's a picture of CC in the record. He has no facial hair. How old is CC? 17. He looks like a boy to me and not a big deal, and I don't know how large he is. Mr. Ellis, the DOC conducted their own investigation, correct? Yes, Your Honor. So they obviously believe that this facility is under their purview, is that? No, Your Honor. Okay. I don't think that's correct. Under what authority, then, did they investigate? My understanding was that the person who was in charge of the facility requested an outside investigation. So there was an internal investigation by the youth center, and they had a person who was responsible for those investigations. But at some point, management decision was they needed someone to come in from outside. And I don't quite understand why that is, but Officer Holder was a longtime employee of that facility, and that may have been the reason why DOC's investigator was asked to come and do the investigation. And then after that investigation, so we had an internal investigation, and then a decision made by management to call in an outside investigation. They brought in someone from DOC. Then the DOC investigator brought in where the police were called somehow, and then there was a police investigation. So the administrative record actually has the testimony of three investigating agencies. They all came to the same conclusion, which is that Officer Holder violated at least the rules of the facility in striking the boy. Now, there was a reference to the police for an assault charge, and the state's attorney made the decision not to press charges. And the testimony of the state's attorney was that there wasn't proof beyond a reasonable doubt. One of our witnesses was asked why the police didn't investigate further, why the prosecution didn't afford it. He said there wasn't, he thought, credible testimony, but that's completely hearsay. And the reasons why the police investigation didn't go forward were explained by the police report, which says that there was not proof beyond a reasonable doubt. So what is the authority for the rules and regulations that this facility operates under if it's not DOC? I'm not sure that the DOC rules apply or don't apply here. I'm just saying that the DOC investigation was conducted because the management of the facility asked for an outside investigation. I don't know whether it's because DOC oversees the Department of Juvenile Justice or not. You're saying it's immaterial if it does? Well, I don't understand why it's immaterial. I think it might be immaterial. I think they're separate investigations. They're presented as separate investigations by different investigators. I don't have any reason to believe that DOC didn't have authority to conduct that investigation. The agencies, and this may be one of the problems, the agencies I think were apart at some point and are now back together or are now back together or are now apart. I'm not sure whether DOC and the other agency are separate agencies or together or not. But I don't see why it should matter. We have two different agency investigations that come to the same conclusion. If the Department of Corrections investigator wasn't authorized to conduct the investigation, there still would be the internal investigation and the police report, which came to the same conclusion. Now, all those investigations, I believe, came in after the Department of Children and Family Services made its indicative finding. But at the hearing, which comes later, they were all available, so they were all tendered as evidence at the hearing. Also, at that hearing, and I want to emphasize this point at some point this morning, we have Officer Holder giving a version of events which was inconsistent with his testimony at the hearing. He's telling investigators that he's pulled himself out of a hole and then throws the punches. At the administrative hearing, he's testifying he had to throw the punches to get himself out of the hole. That inconsistency is an important one because it goes very much to the heart of whether he's the aggressor or not. But I think under either scenario, he's the aggressor because he's free under both scenarios. Under the first scenario, he's free. He's pulled himself out of the hole. He can shut the door, and that's what the ALJ demanded. He should have simply locked the door, and the incident would have come to a conclusion. If he punched up and caused the facial injuries to get out of the hole, then at some point, what was thrown against the wall and scraped his shoulder, that's abuse in some way. It's abuse under the first scenario. It's abuse under the second scenario. Mr. Holder's testimony was simply not believed by the ALJ. There's five or six or seven witnesses here who gave testimony that strongly suggests that this was punches that were thrown in anger and were abusive. And so— Do we have a record, any recording of the telephone conversation? Is that going to be in the record? It is in the record, Your Honor. It's a disk, and I want to be clear because I think there was some confusion with the record. When I ordered the record from the circuit court clerk, only two volumes came to me, and I realized that there were some things that were missing. So I called the clerk, and I asked her to send the rest of the record, and she said they were missing. Eventually, they were found. And what was delivered back to me was five or six additional volumes, which is the guts of our case. And also, the disk went missing, and I asked her to look for that, and then they found that. So all of that should be with your honors as a supplemental record. It should be seven or eight volumes and a CD-ROM disk. Thank you, counsel. Thank you. Counsel. Good morning. Good morning. As one of you has already noted, I had difficulty in applying ANCRA to this situation in spite of what my opponent says, what he says in his reply brief. I think even though we may call it the Harrisburg Youth Center, it is actually a prison for juveniles. It has locks everywhere. It has cells. There's an openness to the place. You go through a series of locked doors, and then there are actually cells that the inmates sleep in. All the inmates are wearing uniforms, just like regular adult DOC persons wear. And, of course, there are a huge list of rules and regulations that apply. And I couldn't help wondering when I was writing this what kind of case this would have been if we were dealing with a parent who actually kept a child in a cell or a caretaker. It would be a very different case. And I also note that in his statement of facts, in the first paragraph, my opponent, in spite of his complaint about it's really not a prison, five times in the first paragraph the word cell appears. Ms. Berger, don't you have to be committed there? Yes. As I understand, Harrisburg, you have to be committed to that facility. Yes. Whether it's by a court. I think by a court. Yes. That's how these children are. So the only way your client could fall within this act is if we somehow construed him to be a custodian. That's the only word in the act that I see that would apply to him. Is that true? I mean, is there any other? I mean, when I think of custodian, I think of the more typical cases where a child may be living with another person who's not actually had formal guardianship. But, you know, I don't know. The word custody, which we use frequently to characterize someone in prison, is also a form of the word custodian. He's definitely in custody. But he's in custody of the state. Yes. But, again. And was Mr. Holger an employee of the state? Do you know? Yes, of the juvenile DOC. But as I pointed out, and I think as you have pointed out, Your Honor, they have an enormous framework of regulations with which to deal. This kind of situation, of course, they did their own investigation. But I think my opponent gets there by saying, well, you know, this really isn't a prison. It's a youth center. It's not designed to punish, but it's really to reduce recidivism and it serves these children in some way. That may be, that's a very lofty goal just as it is for the adult DOC, but I don't think we're there. And if you decide that ANCRA does apply, then you would also have to consider the factors that the ALG did not consider in his opinion. And it is my contention that had he done so, he would have found that, in fact, C.C. was 17 years of age. He had been placed in this facility after escaping from rehab and breaking a window. He was bipolar and he had other mental problems that my client, Mr. Holger, had no prior reports of abuse. C.C. had injured a previous inmate, and I still contend that the injuries were, in fact, minor. By definition, he acts as a disfiguring physical injury. A cut was caused by my client's ring. The cut under the boy's eye was probably the most serious injury. But I think what's really apparent here is that the ALJ just did not consider the self-defense theory at all. He declined to apply it, even though Section 1040 of the Act says that the rules of evidence and privileges do apply for civil proceedings. I don't think that the superficial nature of the injuries here support any kind of talk about excessive force. You have to remember that my client, and it's not on record, but he is shorter than I am, and he had staples in his stomach because of cancer. He was very concerned about being hurt. He was also concerned about the nature of the epithets that were being tossed around by C.C. It wasn't the mere use of the N-word. It was something – there were some really awful things said, and those appear in the record, and I don't need to go. But he was concerned about a possible riot on the block because of the things that were being said. The ALJ's conclusion that my client somehow had the authority to remove himself as though he could have just, you know, clicked his fingers and everything would have been perfectly fine. Well, this whole thing started over somebody who did not want to – who had sneaked out to go to a movie that he wasn't supposed to. C.C. admitted that he had put my client in a headlock, and the finding of the agency that the punching occurred after the headlock is not supported by the record. My client says that he was punching up to get out of the headlock. And therefore, I don't think the agency's finding that he just had the authority to remove himself makes much sense in the context of that situation. I have cited a case regarding self-defense, and I submit that all of the elements there are present. And for all those reasons, I think the ALJ's decision ought to be a deterrent. Thank you, counsel. Counsel? I think it wants a clarification, Your Honor. I don't believe C.C. testified that he had put Officer Holder in a headlock. C.C. testified that he attempted to, and it just didn't work. He said something along those lines. So there was some physical connection, and I think… So there is no hip-hop, you said? I'm saying he's trying. I think it was fair to say he was trying to, but I don't know that he actually ever got there. Because his testimony was it didn't work, which I think makes perfect sense. Officer Holder is a trained guard. It would be a bad thing if he let… I thought he was a caretaker. He was a caretaker. Oh, he's a guard and a caretaker. He is. Okay. There's a suggestion that there was a possible riot concern here. That's not in the record. He said that the use of language was very concerning to him because it could get someone hurt. But he didn't say if there was a riot. The ALJ said specifically that there was a use of excessive force by Mr. Holder. That's a question of facts. The ALJ not only heard all the witnesses, but he toured the facility and came to that conclusion. I think that should be enough to dissuade the Court that there's any concern about a self-defense claim here. Because if there's excessive force being used, it can't be a self-defense claim. My opponent also said he had injured a previous inmate. My recollection of the record is that he had fought a previous inmate. Also, I don't understand why it is of interest that the young man is bipolar. There was no evidence that that has anything to do with anything. So there's no medical exam or anything after this? No. And I don't know why it is meaningful that the young man is bipolar. There's no evidence to suggest that that's material at all. I have a problem with the word prison for juveniles. I think there's no doubt that these young men are locked up, that they're guarded, that they're inmates. Those are all terms that I think are fairly used. But prisoner, I think, is the wrong term. The Department works very hard at their mission, which is to not make it a prison. This is the worst scenario? This is the worst type of way they would keep a juvenile? I think that's probably accurate. Considering what I know from the physical layout of the facility, it seems that the security is pretty tight. But at the same time, we have guards handing out popcorn to these young men as they're watching movies in a common area. I doubt he's dabbled in passing out popcorn to our inmates. I think there's a deliberate attempt to give these young people a chance of not being in prison. And so that's why it's frustrating to me to hear this analogy to the prison being used. Because I think the whole point of this is that they're not prisoners and that they're entitled to more than what prisoners are entitled to. Is there a hierarchy of places they keep juveniles? That this might be the highest of the hierarchy? Your Honor, forgive me, I just don't know. But I do know that this is a very high security facility. Is he on his way down? I don't know. The record says that there's a level one. And he was not level one. So he was not at the level that would allow him to be at the movie that all the other juveniles were at. And that's when this whole thing started. Because he was at this movie when he should have been. So there's a level one addition? At this level. If it works the way I want it to be at sea, you know, as time passes you can improve your security status and you can get privileges. And seeing a movie was a privilege in this facility. And he didn't have that privilege. So I think it's fair to say that he hadn't done enough there to get to that point. Let me ask you one other question. The law that talks about the Child Care Act of 1969, which you all argue that this is a child care facility under Section 2.05, under 2.06 they talk about a child care institution. And they specifically exempt any state-operated institution for child care. And it sounds to me that that's what you're talking about. A juvenile detention place established and operated by any county or child protection district is not included under 2.06, which nobody has talked about. Do you have any comment on that? I mean, you talk about 2.05, but the very next section exempts the juvenile detention center. The argument that you're suggesting, as far as I know, was not made below. I'm sorry? That argument, I think, was not made below. So I'm having a hard time commenting on it because I don't believe it was briefed either by the lawyers below or— I'm not being disrespected. No, no, no problem.  Would you agree that the court has to look at its jurisdiction, always examine its own jurisdiction in assessing a case, whether it's argued or not? Yes, and I know a little something about this because I've just done a case recently. Go ahead. The agency, under jurisdictional questions, the agency considers its own jurisdiction and makes a decision, and then the court reviews it. It's the court's obligation to decide whether the agency has jurisdiction or not. So the question you're raising is certain material, and if the court has questions about that particular section, I'd like an opportunity to read them. I would allow that. Thank you. Thank you. The case will be taken under advisement, and an opinion will come shortly. We'll take a short break at this time.